# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

BETH B. LUDLAM,                          )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )     Civil Action No. 14-988-RGA/MPT
                                         )
CAROLYN W. COLVIN,                       )
Commissioner of Social Security,         )
                                         )
          Defendant.                     )

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

This action arises from the denial of plaintiff's claim for Social Security benefits.

On September 24, 2010, plaintiff filed an application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act (the "Act"). D.I. 5 at 20.  In her

application and disability report, plaintiff claimed she became disabled beginning on

March 16, 2010,[1] due to fibromyalgia,[2] chronic fatigue syndrome, and carpal tunnel in

both hands. *Id.* at 188.  Following the Social Security Administration's ("SSA") denial of

_____

[1] Plaintiff originally alleged her disability began on October 1, 2008.  D.I. 5 at 20.
She amended the onset date to March 16, 2010, because she engaged in "sustained
substantial gainful activity prior to that date." *Id.*

[2] Fibromyalgia is "pain in fibrous tissues, muscles, tendons, ligaments, and other
areas." *Jopson v. Astrue*, 517 F. Supp. 2d 689, 692 n.7 (D. Del. 2007) (citations
omitted).  A diagnosis of fibromyalgia is "made on the basis of an individual's subjective
symptoms after testing has excluded underlying systemic or autoimmune disorders."
*Id.* (citations omitted).  There are no definitive tests for fibromyalgia. *Gonzalez v.
Astrue*, 537 F. Supp. 2d 644, 665 (D. Del. 2008).  Fibromyalgia is described as "elusive"
and "lack[ing] . . . objective symptoms[.]" *Griffies v. Astrue*, 855 F. Supp. 2d 257, 271
(D. Del. 2012).

her claim, both initially and upon reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). *Id.* at 96, 105, 112-13. The hearing occurred on November 19, 2012. *Id.* at 20, 35. At the hearing, testimony was provided by plaintiff and an impartial vocational expert, Christina Beatty-Cody ("Beatty-Cody"). *Id.* at 38-71. On January 8, 2013, the ALJ, Barbara Powell, issued a written decision denying plaintiff's benefits claim. *Id.* at 17-29. Plaintiff requested a review of the ALJ's decision by the Social Security Appeals Council, which was denied on June 3, 2014, following an extension for additional time, which was granted on March 10, 2014. *Id.* at 1-11. On July 25, 2014, plaintiff filed a timely appeal with the court. D.I. 1. Presently before the court are the parties' cross-motions for summary judgment. D.I. 7; D.I. 9. For the reasons that follow, the court will grant in part and deny in part plaintiff's motion for summary judgment, and grant in part and deny in part defendant's motion for summary judgment.

## II.    BACKGROUND

Plaintiff was born on March 9, 1960. D.I. 5 at 72. She has a high school education, and attended two years of college. *Id.* at 40. Her alleged disability dates from March 16, 2010. *Id.* at 38-39. Plaintiff claims her pain began before 2006. *Id.* at 41. She states her pain gradually worsened, and by 2009 her pain prevented her from working. *Id.* She did, however, continue to work until March 16, 2010, when she stopped due to pain and fatigue, and has not worked since this date. *Id.* at 39, 42, 46. Despite her prior vocational experience, plaintiff claims she remains disabled under the Act. *Id.* at 38-62. To be eligible for DIB, plaintiff must demonstrate she is disabled

2

within the meaning of §§216(I) and 223 of the Act. *Id.* at 20.

## A. Evidence Presented

Plaintiff's pain began around 2000. *Id.* at 291-94. In January 2002, she complained of pain in the left buttocks and lower back. *Id.* at 514. Imaging by Diagnostic Imaging Associates ("DIA") revealed mild degenerative changes at L4-L5, but was otherwise normal. *Id.* In May 2005, after complaining of pain and swelling in the right knee, she underwent an MRI by Papastavros' Associates ("Papastavros"), which revealed small to moderate joint effusion but no other abnormalities. *Id.* at 522, 524. She was referred to Papastavros by her family physician, Dr. Horatio Jones ("Dr. Jones"). *Id.* at 522; In June 2005, plaintiff still complained of pain and swelling in the right knee during a visit to Delaware Orthopaedic Center ("DOC"). *Id.* at 304. She had been referred to DOC by Dr. Jones. *Id.* at 303. DOC diagnosed osteoarthritis of the lower leg, and pain relief injections were administered.[3] *Id.* at 305. DOC's records from this visit indicate a previous diagnosis of fibromyalgia, and that plaintiff was taking Prozac, OxyContin, Percocet, Flexeril, and Cataflam. *Id.* at 304.

On July 10, 2006, upon referral by Dr. Jones, plaintiff underwent an x-ray of the cervical spine by DIA for right-sided neck pain, which revealed a reversal of normal cervical lordosis at the upper and mid cervical spine, with alignment maintained. *Id.* at 301. At a July 18, 2006 visit to Dr. Jones, she reported insomnia and a "fibromyalgia flare" due to hot weather. Plaintiff also mentioned a past diagnosis of ADD, for which she had been prescribed Adderall XR, and a past history of hypercholesterolemia. *Id.*

---

[3] An x-ray of the right knee by DOC in June 2005 revealed mild joint space narrowing and mild sclerosis. D.I. 5 at 304.

3

at 441-45. On August 15, 2006, plaintiff complained of migraines to Dr. Jones, who prescribed Zomig for the migraines and Lunesta for insomnia. *Id.* at 442-43. His records also indicate that plaintiff was taking Dilaudid for breakthrough pain. *Id.* On December 26, 2006, Dr. Jones diagnosed clinical depression, and prescribed Lexapro. *Id.* at 311.

By February 2007, plaintiff's clinical depression had significantly improved after switching from Lexapro to Cymbalta. *See id.* at 309-10, 312. She reported increased fibromyalgia pain due to cold weather, and requested a letter to be sent to her employer stating she could only work part-time, which Dr. Jones provided on April 26, 2007. *Id.* at 312-13. Throughout the remainder of 2007, her fibromyalgia generally remained stable, with occasional worsening due to hot weather. *Id.* at 314-322.

In April and May 2008, plaintiff reported memory impairment, which was attributed to her ADD and medications, since all neurological findings were normal. *Id.* at 297-300. Through July 2008, her fibromyalgia remained stable, although she began experiencing pain in the right neck and shoulder in March 2008. *Id.* at 323-34.

On July 13, 2009, plaintiff, then working as a salesperson at Raymour and Flanigan Furniture, requested to work part-time under the Family Medical and Leave Act ("FMLA") due to her fibromyalgia pain. *Id.* at 288-96. On the FMLA certification form, Dr. Jones attested plaintiff was unable to stand, sit, or walk for extended periods of time, and would occasionally miss work because of fibromyalgia pain. *Id.* at 291-94. In a letter to plaintiff's employer, Dr. Jones described the fibromyalgia pain as "severe[,] generalized pain year round" as opposed to seasonal pain affected by weather. *Id.* at

4

295. By December 2009, plaintiff considered stopping work and seeking disability because of her "ongoing, chronic" fibromyalgia pain. *Id.* at 398. That same month, pain began in her right wrist. *Id.* at 394.

After plaintiff stopped working, she was examined on April 5, 2010, by Dr. Peter V. Rocca ("Dr. Rocca"), a rheumatologist. *Id.* at 267-68, 357. She described suffering from constant flu-like symptoms and "phantom pains" in multiple areas of her body. *Id.* at 268. At that time, she was taking OxyContin, Percocet, Adderall, Vyvanse, and Cymbalta. *Id.* Dr. Rocca recommended cognitive behavioral therapy.[4] *Id.* at 269, 466. On April 14, 2010, Dr. Jones prepared an FMLA report stating plaintiff was unable to work due to fatigue and fibromyalgia pain which had worsened despite "maximum . . . therapy." *Id.* at 260-63.

On May 3, 2010, Dr. Rocca completed an Attending Physician's Statement of Functionality, and noted plaintiff could sit, stand, and walk for only an hour each; could occasionally[5] lift up to 20 pounds, bend at the waist, kneel, crouch, drive, reach, finger, and handle; and could never lift more than 20 pounds. *Id.* at 356-57. On May 4, 2010, however, Dr. Jones completed a Physical Capacities Evaluation Form for plaintiff's short-term disability insurance claim, reporting she could not sit, stand, or walk at all; could not lift, carry, push, or pull any weight; and could not climb, balance, stoop, kneel,

---

[4] Plaintiff characterized this as "mental therapy." D.I. 5 at 466. Cognitive behavioral therapy "seeks to identify the thinking associated with unwanted feelings and behaviors in order to replace it with thoughts leading to more desirable reactions." *Mr. I. ex rel. L.I. v. Maine School Admin. Dist. No. 55*, 480 F.3d 1, 7 n.5 (1st Cir. 2007) (citations omitted). It is an alternative method of pain relief, similar to yoga, acupuncture, or relaxation techniques. *Griffies v. Astrue*, 855 F. Supp. 2d 257, 262 (D. Del. 2012).

[5] "Occasionally" is defined as 1-33% of the time. D.I. 5 at 357.

5

crouch, crawl, or reach either above the shoulder or below waist level. *Id.* at 365-66,
373-75. Dr. Jones stated plaintiff could occasionally drive, reach at the waist/desk
level, handle, finger, and feel. *Id.* at 365-66.

Dr. Jones referred plaintiff to Dr. Chukwuma Obi Onyewu ("Dr. Onyewu") of the
Mid Atlantic Spine and Pain Clinic ("MASPC"), who initially examined her on August 4,
2010. *Id.* at 465-66, 505-08. She described suffering "constant[,] dull" pain with an
intensity of 8/10 that would "travel[ ] throughout the body in no particular pattern," but
the pain was "controlled with medications and rest." *Id.* at 505. She reported taking
Percocet, OxyContin, Cymbalta, and Adderall. *Id.* at 506. At a follow-up visit on August
18, 2010, Dr. Onyewu decreased the OxyContin and Percocet. *Id.* at 502.

On September 1, 2010, plaintiff still complained of "constant[,] dull [pain of] 8/10
in intensity" during a visit to Dr. Onyewu. *Id.* at 497. Dr. Onyewu discontinued the
OxyContin, as it was ineffective in treating her pain. *Id.* On September 15, 2010, Dr.
Onyewu performed an EMG[6] of plaintiff's bilateral upper extremities, which was
abnormal and revealed evidence of bilateral carpal tunnel, bilateral median nerve
sensorimotor neuropathy, and possible sensory radiculopathy. *Id.* at 496. An MRI of
the cervical spine on September 29, 2010 showed a large posterior bone ridge complex
at C4-C5 and C5-C6, and a small disc protrusion at C6-C7. *Id.* at 367, 491-95, 645.
That same day, Dr. Onyewu confirmed carpal tunnel syndrome, and plaintiff was fitted
for wrist braces on October 6. *Id.* at 487, 491. During this time, an MRI of the lumbar

---

[6] "EMG, or electromyography, is a technique that evaluates and records the
physiologic properties of muscles." *Boulanger v. Astrue*, 520 F. Supp. 2d 560, 565 n.11
(D. Del. 2007).

6

spine showed normal findings. *Id.* at 650. On October 13, 2010, Dr. Onyewu reported an EMG on October 6 of plaintiff's lower extremities revealed bilateral L5 motor radiculopathy, with cord impingement at C4-C5 caused by the boney ridge complex. *Id.* at 486, 488.

On November 16, 2010, Dr. Onyewu performed posterior cervical facet joint nerve blocks ("nerve blocks"). *Id.* at 478. The procedures were successful; however, during a November 24 visit to Dr. Onyewu, plaintiff advised the nerve blocks only provided temporary relief for two days. *Id.* at 475, 478. She reported "adequate pain relief" from her medications, Cymbalta, Rozerem, Percocet,[7] MS Contin, OxyContin, and Adderall. *Id.* at 475-76. Plaintiff underwent further successful nerve blocks by Dr. Onyewu on December 7, 2010. *Id.* at 473.

On December 15, 2010, an MRI of plaintiff's right knee by Imaging Group of Delaware ("IGD") showed only a small oblique tear in the posterior horn of the lateral meniscus and narrowing of the lateral patellofemoral condylar space. *Id.* at 652. On February 1, 2011, she underwent a T7-T9 nerve block, which provided 100% pain relief for four to five hours. *Id.* at 550, 553. On February 16, 2011, an MRI was conducted on her left knee because of pain. *Id.* at 648-49. Except for a finding of mild tricompartmental degenerative changes, the findings of the MRI were normal. *Id.*

During an office visit with Dr. Onyewu on March 16, 2011, plaintiff reported overall body pain of 7-8/10, which was managed by medication. *Id.* at 556. Dr. Onyewu noted plaintiff had "failed prior conservative care." *Id.* at 558. There was no

---

[7] Plaintiff was prescribed two dosages of Percocet: the higher for "breakthrough pain," and the lower to be taken regularly. *See* D.I. 5 at 476.

change in pain reported at follow-up visits to Dr. Onyewu on April 13, May 11, June 8, and July 6, 2011. *Id.* at 550, 553, 629, 633.

On May 20, 2011, Dr. Onyewu completed a Residual Function Capacity Evaluation ("RFC"). *Id.* at 582-84. It included diagnoses of cervical spondylosis, neck pain, knee pain, fibromyalgia, and chronic pain syndrome, and noted plaintiff could not lift or carry any weight in an eight-hour workday, could stand, walk, or sit for one to two hours at a time or four hours total in an eight-hour workday. *Id.* at 582. She could remain at a workstation for four hours of an eight-hour workday, and would require 15-minute-long unscheduled breaks every hour to "change positions frequently[.]" *Id.* The RFC described plaintiff's side effects from medication as mild,[8] and her pain as moderate,[9] but her "significant neck pain" would prevent completing an eight-hour workday. *Id.* at 582-83. According to the RFC, plaintiff would miss four days of work a month and at least one hour of work one day a month due to pain. *Id.* at 583.

Dr. Onyewu further noted plaintiff should never climb ladders, push, or pull; could rarely[10] twist, stoop, crouch, squat, climb stairs, reach, and handle; and could occasionally[11] finger and feel. *Id.* The doctor described that plaintiff has "pain with repetitive activity, overhead activity, flexion/extension of neck along with prolonged sitting, standing[,] and walking[.]" *Id.* He further concluded she could not to perform

---

[8] "Mild" is defined as causing a loss of up to 30 minutes of productivity out of an eight-hour workday. D.I. 5 at 584.

[9] "Moderate" means causing a loss of 31-90 minutes of productivity during an eight-hour workday. *Id.*

[10] "Rarely" means 1-5% of an eight-hour workday. *Id.* at 583.

[11] "Occasionally" is defined as 6-33% of an eight-hour workday. *Id.*

8

full-time sedentary work[12] because of knee and neck pain, but could perform part-time sedentary work, with no lifting. *Id.* at 584.

On July 27, 2011, plaintiff underwent a successful series of thoracic nerve blocks by Dr. Onyewu. *Id.* at 627. During a follow-up visit on August 3, 2011, she reported more than 80% pain relief from the prior nerve blocks. *Id.* at 623. By August 31, 2011, however, she reported worsening lower back pain to Dr. Onyewu, who diagnosed bilateral PSIS with severe tenderness.[13] *Id.* at 619. Plaintiff advised she was stable on the pain medications. *Id.*

On September 21, 2011, plaintiff underwent posterior thoracic facet joint nerve ablations ("nerve ablations") by Dr. Onyewu which provided pain relief. *Id.* at 617-18. At a follow-up visit on September 28, 2011, Dr. Onyewu noted the pain was "decreasing as time progress[es]," but plaintiff continued experiencing significant lower back pain. *Id.* at 611. During a visit with Dr. Jones on November 4, 2011, she reported the fibromyalgia pain was under control with treatment provided by her pain specialist. *Id.* at 669.

On April 4, 2012, plaintiff complained of chronic neck and upper back pain to Dr. Onyewu.[14] *Id.* at 608. She reported 100% relief on the left side for 5 days, with 70-80%

---

[12] "Sedentary work" consists primarily of sitting, with no more than occasional walking and standing, occasional lifting of up to 10 pounds, with repetitive hand-finger actions. *Id.* at 584.

[13] PSIS is the acronym for posterior superior iliac spine. *Ames v. Astrue*, 11-CV-1775, 2013 WL 435451, at *13 (M.D. Pa. Feb. 4, 2013).

[14] No medical records of plaintiff from November 8, 2011 to April 4, 2012 were submitted in evidence, except for a Disability Determination Services report dated February 24, 2012 which found she could to return to her position as a furniture salesperson. *See* D.I. 5 at 561, 569-70, 586-87, 608, 611, 667-68.

relief on the right side for only a few hours.[15]  *Id.*  At a follow-up visit with Dr. Onyewu on May 2, 2012, she related the medication was not managing her pain.  *Id.* at 605.  After nerve ablation on May 22, 2012, she reported to Dr. Onyewu more than a 50% reduction in bilateral PSIS pain, with significant reduction in overall body pain.  *Compare id.* at 603 *with id.* at 605.  By June 27, 2012, however, her overall body pain returned to the intensity before nerve ablation.  The pain intensity was unchanged as of July 25, 2012.  *Id.* at 592-93, 597.  On August 14, 2012, Dr. Onyewu administered an injection to her sacroiliac joint which provided pain relief.  *Id.* at 592.

On September 30, 2012, Dr. Onyewu prepared a second RFC, which listed diagnoses of fibromyalgia, cervical disc herniation, knee meniscus tear, carpal tunnel syndrome, sacralgia, lumbar radiculitis and depression.  *Id.* at 579-81.  He confirmed plaintiff's neck pain was due to cervical disc herniations.  *Id.* at 580.  His report concluded plaintiff could lift up to five pounds occasionally, and she could stand or walk for one-half to one hour at a time for a total of three hours and sit for one to two hours at a time for a total of four hours of an eight-hour workday.  *Id.*; *see supra* note 11.  She could remain at a workstation for four to five hours of an eight-hour workday, with breaks alternating between sitting and standing.  D.I. 5 at 579.  She further needed to recline for thirty minutes to an hour and to elevate her legs at or above hip level for one to two hours, with three 15-to-20-minute unscheduled breaks during an eight-hour workday.  *Id.*

In the RFC, Dr. Onyewu described plaintiff's side effects from medication as

---

[15] The record does not specify the cause for her pain relief.

10

mild, and her pain as moderate to severe.[16]  *Id.* at 579; *see supra* notes 8 and 9.  He

stated that pain interfered with her ability to work, causing the loss of two to four

workdays a month, and minimally one hour of work time two to four days a month.  D.I.

5 at 580.  He restricted plaintiff from climbing ladders, and she could rarely twist, stoop,

crouch, squat, reach, push, and pull, and occasionally could climb stairs, handle, finger,

and feel.  *Id.*; *see supra* notes 10-11.  Dr. Onyewu determined plaintiff was unable to

perform sedentary work on either a full-time or part-time basis.  *Id.* at 581; *see supra*

note 12.  In justifying this conclusion, he stated:

> Over the past 18 months since I have been involved in Mrs. Ludlam's
> care, I do not believe she would be able to sustain gainful employment
> even at a sedentary level consistently [of] 8 hours [a] day for 40 hours [a]
> week.  She requires high dose[s of] narcotic pain medications to control
> her pain issues as previously described[.]  Her pain would cause
> inconsistency in her work tolerance.  By the definition above she would
> not qualify for sedentary work.

D.I. 5 at 581.  Dr. Onyewu further determined that due to the lifting requirement, plaintiff

could not perform sedentary work because of carpal tunnel syndrome.  *Id.*

## B.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the November 19, 2012 hearing, plaintiff testified about her background, work

history, pain, and treatment.  *Id.* at 35, 38-64.  She is approximately five-foot-three-and-

a-half inches tall and weighs about 230 pounds.  *Id.* at 38-39.  She is married, and lives

with her husband and 25-year-old son.  *Id.* at 39.  She has not worked since March 16,

2010.  *Id.*  She completed high school, and attended two years of college.  *Id.* at 40.

---

[16] "Severe" is defined as causing a loss of more than 90 minutes of productivity in
an eight-hour workday.  D.I. 5 at 581.

She described her knee pain as worse on the right because of the meniscus tear. *Id.* She stated some days are worse than others, and climbing stairs is a challenge. *Id.* at 41.

Plaintiff claimed her pain began before 2006. *Id.* She described "working herself harder" in 2006 to sell $1 million worth of furniture, which caused exhaustion. *Id.* at 41-42. In subsequent years, her pain increased to the point where she could not work. *Id.* at 41. She was transferred to a store without steps. *Id.* at 41-42. By 2010, she was absent from work due to pain; her supervisor was accommodating. *Id.* at 42. She would nap in her car three or four times a day, since walking on the job made her tired. *Id.* Typing was difficult due to the carpal tunnel. *Id.* She occasionally experienced hand numbness. *Id.*

Plaintiff testified she had been a furniture salesperson her entire career, but also occasionally assisted her husband with bookkeeping, when he was self-employed. *Id.* at 42-46. Her work as a furniture salesperson rarely involved pushing mattresses, and did not involve lifting. *Id.* at 44. She stopped working because of pain and tiredness. *Id.* at 46. She does grocery shopping once a week, but that outing significantly exhausts her for the next thirty-six hours. *Id.* She requires assistance from store employees to load the groceries into the cart and her car. *Id.* According to plaintiff, her husband's salary is the sole source of household income since her private disability income expired. *Id.* at 46-47.

In describing her pain and fatigue, plaintiff claimed she was diagnosed with fibromyalgia in the 1980s, which has progressively worsened. *Id.* at 47. Her

12

fibromyalgia was "undescribable," with the pain moving throughout her body. *Id.* Her neck pain was very symptomatic during the hearing. *Id.* Plaintiff stated MRIs revealed disc displacement at C4/5 and C5/6. *Id.* EMGs of her hands and legs noted bilateral carpal tunnel of the wrists and hands and minor impingement of the legs, which occasionally caused leg weakness. *Id.* at 48-49.

Her present medications are Exalgo, Cymbalta, and Flexeril for pain; Cataflam for inflammation; Restoril for sleep; Adderall and Vyvanse for ADD; and Zomig for migraines. *Id.* at 51 She explained Cataflam, Flexeril, and Zomig are taken as needed; the other medications are taken daily. *Id.* at 52.

Regarding her daily activities, plaintiff claims she does "nothing." She has a valid driver's license, and only drives to the doctor and the grocery store. *Id.* at 52. Her husband does the laundry, and her son does most of the cooking. *Id.* at 53. Plaintiff occasionally may prepare a meal, but immediately tires thereafter and goes to bed. *Id.* She is unhappy with her limited activity, describing her life as "boring" compared to when she was employed. *Id.* When friends visit, she remains on the couch. *Id.* at 53-54. She is unable to attend any sporting events with her husband despite having season tickets, and used to attend church. *Id.* at 54-55. Plaintiff also explained that temperature extremes, hot or cold, rain, and humidity changes aggravate pain, with particular sensitivity to barometric pressure changes. *Id.*

Plaintiff testified all prescribed medications provide relief, but Exalgo is less effective than Percocet, a former medication. *See id.* at 55. She did not claim any side effects from the medications. *Id.* at 56. She considers Dr. Onyewu as her pain

13

management specialist. She described the ablations performed by him as "deaden[ing] the nerves" at three points on her back, and providing six to eight months of pain relief before more severe pain returned. *Id.*

Plaintiff related no surgery has been recommended by any physician for the carpal tunnel. *Id.* at 57. Her symptoms from that condition are tingling, loss of sensation and strength in her hands, episodic hand swelling, and discoloration. *Id.* at 59-60. For relief and treatment, she wears bilateral hand braces at night. *Id.* at 57. She experiences radiating pain from the neck-clavicle area to her arms due to cervical radiculopathy. *Id.* at 58-59. Her mid-back pain radiates to her front and into the pelvic area. *Id.* at 61.

Plaintiff has not undergone any mental health treatment since 2010. She only seeks the hospital care for migraines unresponsive to medication. *Id.* at 60. She was recently diagnosed with diabetes, which is managed through diet. *Id.* Her heart and other internal organs "are good." *Id.* She identified Dr. Jones as her family physician, who treats the ADD and had originally managed her pain. *Id.* at 61-62.

## 2. The Vocational Expert's Testimony

Beatty-Cody testified about plaintiff's background, skills, and limitations, and the jobs available within her restrictions. *Id.* at 62-69. Plaintiff's past relevant work history was as a furniture salesperson[17] and accounting clerk.[18] *Id.* at 63.

During the hearing, the ALJ posed several hypothetical situations. *Id.* at 64-69. All were based on a hypothetical 52-year-old woman with slightly more than a high

---

[17] This employment is high semi-skilled and light exertion. *Id.* at 63.
[18] Skilled position with sedentary exertion. *Id.*

14

school education and who can read, write, and use numbers and having plaintiff's past work history. *Id.* at 64.

In the first hypothetical, the individual could lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk and sit six hours; occasionally stoop, crouch, crawl, squat, kneel, balance, and climb stairs; and had to avoid ladders, scaffolds, dangerous heights, dangerous machinery, cold, and vibrations. *Id.* The hypothetical person suffers chronic fatigue, but can understand, remember, and carry out detailed instructions and concentrate if provided with customary work breaks throughout the day. *Id.* at 65. That person is also able to perform within a schedule, be on time, produce an adequate amount of work, and limit breaks to appropriate times. *Id.* Contacts with the general public should be limited to occasional. *Id.* In response, Beatty-Cody testified that the employment available included an accounting, information, general, or file clerk. *Id.* at 65-66. These positions are light exertion jobs, except the accounting clerk, which is sedentary. *Id.* at 63, 65-66.

The ALJ's second hypothetical was identical to the first, except the individual could only stand and walk for two to six hours. *Id.* at 66. Beatty-Cody testified that all of the jobs previously identified were still available with the new limitation. *Id.*

The ALJ's third hypothetical limited the jobs to specific vocational preparation ("SVP") 1 and 2 only. *Id.* At SVP 1 and 2, Beatty-Cody testified that the positions of inspector, routing clerk, and order caller are available. *Id.* at 66-67. These jobs are light exertion with SVPs of 2. *Id.*

The ALJ's fourth hypothetical included the restrictions of the prior hypothetical,

15

with the additional limitation of occasional use of hands, specifically for fingering and grasping. *Id.* at 67-68. Under this hypothetical, Beatty-Cody testified that only the order caller job was feasible. *Id.*

In the final hypothetical, the ALJ attributed all of plaintiff's asserted medical conditions[19] to the hypothetical person, and her doctors' limitations regarding full-time work. *Id.* at 68-69. Beatty-Cody concluded such an individual could not "sustain work in the competitive workforce" with those conditions due to loss of productivity.[20] *Id.* at 69.

## C. The ALJ's Findings

Based on the medical evidence and testimony, the ALJ determined plaintiff was not disabled and, therefore, ineligible for DIB. *Id.* at 17-29. The ALJ's findings are summarized as follows:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
>
> 2. The claimant has not engaged in substantial gainful activity since March 16, 2010, the alleged onset date (20 C.F.R. 404.1571 *et seq.*).
>
> 3. The claimant has the following severe impairments: degenerative disc disease; fibromyalgia/chronic pain syndrome; carpal tunnel syndrome; and obesity (20 C.F.R. 404.1520(c)).

---

[19] Those conditions included psychiatric issues and side effects from high doses of medications. *Id.* at 68.

[20] Beatty-Cody inferred the hypothetical person would experience more than a 15-20% productivity loss due to absences, tardiness, and being off-task. *See id.* at 69. This percentage of lost productivity is unacceptable for unskilled work, and would result in termination. *See id.*

16

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except she can stand and walk at least 2 hours but less than 6 hours, and sit 6 hours in an 8 hour workday; can occasionally perform postural activities; should avoid hazards, cold and vibrations; limited to simple unskilled work; and only occasional contact with the general public.

6. The claimant is unable to perform any past relevant work. (20 C.F.R. 404.1565).

7. The claimant was born on March 9, 1960 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 C.F.R. 404.1563).

8. The claimant has at least a high school education and is able to communicate in English. (20 C.F.R. 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 16, 2010, through the date of this decision (20 C.F.R. 404.1520(g)).

17

D.I. 5 at 22, 24, 28-29.

## III.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties moved for summary judgment. In determining the appropriateness

of summary judgment, the court must "review the record as a whole, 'draw[ing] all

reasonable inferences in favor of the non-moving party[,]' but [refraining from] weighing

the evidence or making credibility determinations." *Reeves v. Sanderson Plumbing*

*Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted). If "there is no genuine issue

as to any material fact" and the movant is entitled to judgment as a matter of law,

summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d

Cir. 2005) (quoting FED. R. CIV. P. 56(c)).

This standard does not change merely because there are cross-motions for

summary judgment. *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir.

1987). Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary
> judgment, and the making of such inherently contradictory claims does not
> constitute an agreement that if one is rejected the other is necessarily
> justified or that the losing party waives judicial consideration and
> determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). "The filing of cross-

motions for summary judgment does not require the court to grant summary judgment

for either party." *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990).

### B.    Review of the ALJ's Findings

Section 405(g) sets forth the standard of review of an ALJ's decision. The court

18

may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not contain substantial evidence to support the ALJ's decision. The Commissioner's factual decisions are upheld if supported by substantial evidence. *See* 42 U.S.C. §§405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckle*, 806 F.2d 1185, 1190 (3d Cir. 1986). Substantial evidence means less than a preponderance, but more than a mere scintilla of evidence. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has found, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a *de novo* review of the decision nor re-weigh the evidence of record. *Monsour*, 806 F.2d at 1190. The court's review is limited to the evidence that was actually presented to the ALJ. *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). The Third Circuit has explained that a:

single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., evidence offered by treating physicians) or if it really constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the court would have decided the case differently, it must defer

19

to and affirm the ALJ so long as the decision is supported by substantial evidence. *Monsour*, 806 F.2d at 1190-91.

Where "review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision." *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011). In *SEC v. Chenery Corp.*, the Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." 332 U.S. 194, 196 (1947). "If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Id*. The Third Circuit has recognized the applicability of this finding in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001). This court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa. 2005). In Social Security cases, the substantial evidence standard applies to motions for summary judgment brought pursuant to FED. R. CIV. P. 56. *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

**IV.   DISCUSSION**

### A.   Parties' Contentions

In her appeal, plaintiff contends the ALJ improperly afforded great weight to the non-examining State Agency physicians, and not her treating physicians. D.I. 8 at 1. She maintains that the ALJ relied upon a hypothetical person who did not include all her

medically-determined limitations, with no explanation provided for excluding certain limitations, and with these restrictions, she cannot perform any of the identified jobs. *Id.* Plaintiff further argues the ALJ's finding as to her ability to stand and walk is non-specific, and if the lower values for standing and walking are applied, she is disabled under the medical-vocational rules. *Id.* Finally, she claims the ALJ's decision lacks the proper articulation of a meaningful judicial decision. *Id.*

The Commissioner counters: the ALJ afforded proper weight to the medical opinion evidence of record; the ALJ's hypothetical questions properly included all limitations supported by substantial evidence; the ALJ's assessed walking and standing limitations do not transform plaintiff's RFC from light work to sedentary work; and the ALJ properly completed the step-two analysis. D.I. 10 at 8, 14, 16, 18.

## B. Disability Analysis

Title II of the Act, 42 U.S.C. § 423(a)(l)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen*, 482 U.S. at 140. To qualify for DIB, a claimant must establish disability prior to the date she was last insured. *See* 20 C.F.R. §404.131. A "disability" is defined as the inability to do any substantial gainful activity because of any medically determinable physical or mental impairment, which either could result in death or has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §§423(d)(l)(A), 1382(c)(a)(3). To be disabled, the severity of the impairment must prevent return to previous work, and based on age, education, and work experience, restrict "any other kind of substantial gainful work

21

which exists in the national economy." 42 U.S.C. §423(d)(2)(A); *Barnhart v. Thomas,*
540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to
perform a five-step sequential analysis. 20 C.F.R. §404.1520; *see also Plummer v.*
*Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can
be made at any point in the sequential process, the review ends. 20 C.F.R.
§404.1520(a)(4). At the first step, the Commissioner must determine whether the
claimant is engaged in any substantial gainful activity, and if so, a finding of non-
disabled is required. 20 C.F.R. §404.1520(a)(4)(l). If the claimant is not so engaged,
step two requires the Commissioner to determine whether the claimant is suffering from
an impairment or a combination of impairments that is severe. If no severe impairment
or a combination thereof exists, a finding of non-disabled is required. 20 C.F.R.
§404.1520(a)(4)(ii).

If the claimant's impairments are severe, the Commissioner, at step three,
compares them to a list of impairments (the "listings") that are presumed severe
enough to preclude any gainful work. 20 C.F.R. §404.1520(a)(4)(iii); *Plummer*, 186
F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in
the listing, the claimant is presumed disabled. 20 C.F.R. §404.1520(a)(4)(iii). If a
claimant's impairment, either singularly or in combination, fails to meet or medically
equal any listing, the analysis continues to steps four and five. 20 C.F.R.
§404.1520(e). At step four, the Commissioner determines whether the claimant retains
the RFC to perform her past relevant work. 20 C.F.R. §404.1520(a)(4)(iv); *Plummer*,
186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite

the limitations caused by [her] impairment(s)." *Fargnoli*, 247 F.3d at 40. "The claimant bears the burden of demonstrating an inability to return to [her] past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude adjusting to any other available work. 20 C.F.R. §404.1520(g); *Plummer*, 186 F.3d at 427- 28. At this final step, the burden is on the Commissioner to show the claimant is capable of performing other available work existing in significant national numbers and consistent with the claimant's medical impairments, age, education, past work experience, and RFC before denying disability benefits. *Plummer*, 186 F.3d at 427-28. In making this determination, the ALJ must analyze the cumulative effect of all the claimant's impairments and often seeks the assistance of a vocational expert. *Id.*

### 1. Weight Accorded to Drs. Onyewu, Jones, and Rocca

Plaintiff asserts the ALJ erred by failing to give the opinions of Drs. Jones, Rocca, and Onyewu appropriate weight. D.I. 8 at 6, 7. A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). Such reports will be afforded controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence on

record. *Fargnoli*, 247 F.3d at 43.

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled. *Morales*, 225 F.3d at 317 (citing *Plummer*, 186 F.3d at 429). It is error, however, to apply controlling weight to an opinion merely because it comes from a treating source if it is not well-supported by the medical evidence, or inconsistent with other substantial evidence, medical or lay, in the record. SSR 96-2p, 1996 WL 374188 at *2. If the ALJ rejects the treating physician's assessment, she may not make "speculative inferences from medical reports," and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence." *Plummer*, 186 F.3d at 429. Further, medical testimony from a doctor who has never examined the claimant should not be given credit if it contradicts the testimony of the claimant's treating physician. *Dorf v. Bowen*, 794 F.2d 896, 901 (3d Cir. 1986.)

When not affording a physician's report controlling weight, the ALJ must examine multiple factors. 20 C.F.R. §404.1527(c). These factors include the "[e]xamining relationship," the "[t]reatment relationship" which considers the "[l]ength of the treatment relationship and the frequency of examination," the "[n]ature and extent of the treatment relationship," the degree and extent the relevant evidence supports a treating physician's opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating physician in relation to the medical issues involved. *Id.* An ALJ must weigh the evidence in the record. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000). Failure of an ALJ to examine and elaborate on these

factors is grounds for remand. *Solomon v. Colvin*, C.A. No. 12–1406–RGA–MPT, 2013
WL 5720302, at *12 (D. Del. Oct. 22, 2013).

### a. Drs. Onyewu and Jones

Here, the ALJ did not properly weight to the findings of Dr. Onyewu. The ALJ
gave "little weight" to Dr. Onyewu's findings because he consistently noted "a smooth
and coordinated gait, and normal muscle strength," and because plaintiff's carpal tunnel
does not require surgery, but is manageable through medication and wrist braces. D.I.
5 at 27. Dr. Onyewu determined plaintiff suffered from fibromyalgia, cervical disc
herniation, knee meniscus tear, carpal tunnel syndrome, sacralgia, and lumbar
radiculitis. *Id.* at 579. He listed numerous restrictions on plaintiff's abilities to sit, stand,
walk, and engage in various activities. *Id.* at 579-80.

In determining the weight accorded to Dr. Onyewu's findings, the ALJ noted
plaintiff's "smooth and coordinated gait, and normal muscle strength;" her use of wrist
braces for the carpal tunnel; her statement of "adequate pain relief with current
medication" on November 24, 2010;[21] her March 2011 comment of experiencing
complete pain relief from the February 1, 2011 nerve block; and continued reports of
the beneficial effects of the medications without adverse reactions. *Id.* at 25-26.
Although plaintiff admitted to significant pain relief from the February 2011 nerve block,
it was temporary and lasted for only a few hours. *Id.* at 550, 553, 556. During an office
visit with Dr. Onyewu on August 14, 2012, she complained of chronic pain in numerous
areas of the body with intensities ranging 3/10 to 8/10. *Id.* at 592-93. In his September

---

[21] On May 2, 2012, plaintiff relayed "inadequate pain control with her current
medication" to Dr. Onyewu. D.I. 5 at 605.

25

30, 2012 RFC evaluation, Dr. Onyewu concluded that because of the carpal tunnel with attendant hand pain, numbness, and lifting restrictions, plaintiff could not perform sedentary work. *Id.* at 579-81.

The ALJ gave "great weight" to the reports of the State Agency medical consultants, Drs. Acuna and Dalton, who never examined plaintiff. *Id.* at 26-27, 72-82, 85-94, D.I. 8 at 6. These reports, however, were from January 13, 2011 and June 10, 2011, and before Dr. Onyewu's September 2012 RFC evaluation. D.I. 5 at 81, 94, 579-81. Since these reports were issued over a year before Dr. Onyewu's later findings,[22] the ALJ erred by affording them great weight. *Id.* at 26-27; *Dorf*, 794 F.2d at 901.

The ALJ acknowledged that the factors in §404.1527(c) must be considered, but failed to address them in her opinion. D.I. 5 at 24. Dr. Onyewu had a continuing treatment relationship with plaintiff, which began in August 2010 and entailed frequent visits and examinations over a two year period. *Id.* at 505, 579, 582, 592. He provided extensive treatment to plaintiff for pain, including nerve blocks, ablations, an injection, and numerous prescriptions. *Id.* at 473, 475-76, 478, 497, 502, 506, 550, 553, 592, 603, 617-18, 627. In reaching his conclusions, he also relied on objective testing, such as EMGs and MRIs. *Id.* at 367, 486, 488, 491-96, 645, 650.

The record evidence confirms Dr. Onyewu's diagnoses. *Id.* at 579. His records consistently show plaintiff suffers intense pain. *Id.* at 475, 483, 488, 491, 497, 502,

---

[22] Relying on their respective single reviews of the then record, the state doctors found plaintiff can occasionally lift 20 pounds and capable of light work. Based on his evaluations over the two year period, Dr. Onyewu concludes plaintiff can occasionally lift five pounds and incapable of sedentary work. (*Compare* D.I. 5 at 78, 93 *with* D.I. 5 at 579, 581.)

505, 550, 553, 556, 593, 597, 603, 605, 608, 611, 619, 623, 629, 633. Importantly, Dr. Onyewu specializes in pain management. *Id.* at 56. The ALJ failed to consider these factors. As a result, the matter should be remanded for the ALJ to elaborate upon the elements of 20 C.F.R. §404.1527(c) regarding the appropriate weight afforded to Dr. Onyewu, a treating physician. *Solomon,* 2013 WL 5720302, at *12.

Similarly, the ALJ did not properly weight the medical findings of Dr. Jones, another treating physician. The ALJ assigned "little weight" to his opinion, concluding that Dr. Jones did not provide objective testing or physical examination findings to corroborate plaintiff's "subjective reports of pain." D.I. 5 at 27. The ALJ acknowledged the relevance of §404.1527(c), but failed to elaborate. *Id.* at 24. Dr. Jones treated plaintiff for over ten years. *Id.* at 25. The ALJ, however, seemingly ignored that this lengthy treating relationship likely provided a "detailed, longitudinal picture of [ ] medical impairment(s)" bringing "a unique perspective to the medical evidence that *cannot be obtained from the objective findings alone* . . . ." 20 C.F.R. §404.1527(c)(2) (emphasis added). "Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." SSR 96-8p, 1996 WL 374184 at *5.

Therefore, this matter should be remanded for the ALJ to explain the basis in the weight accorded to Dr. Jones's opinion consistent with 20 C.F.R. §404.1527(c).

### b.    Dr. Rocca

Here, the ALJ properly weighted the opinion of Dr. Rocca. The ALJ afforded

"some weight" to Dr. Rocca's opinion because he only examined plaintiff on one occasion, and therefore, did not have an extensive treating relationship with her. D.I. 5 at 27. The ALJ also noted that Dr. Rocca's postural and lifting restrictions are consistent with the record. *Id.* While this consistency entitles Dr. Rocca's opinion to more weight under 20 C.F.R. §404.1527(c)(4), it must be balanced with the short duration of the treating relationship. Therefore, the ALJ's decision to afford Dr. Rocca's opinion some weight is adequately supported.

## C. Vocational Expert Testimony of Available Work

Plaintiff asserts that the ALJ erred by failing to include all of her limitations in the hypothetical. Hypothetical questions posed to a VE need only reflect impairments supported by the record. *See McDonald v. Astrue*, No. 07-4493, 2008 WL 4368226, at *3 (3d Cir. 2008). Consequently, when a hypothetical is accurate, a VE's response constitutes substantial evidence. *See id.* (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)). A VE's testimony is only valid if based on a hypothetical question that accurately reflects a claimant's physical and mental limitations. *See Myers v. Comm'r of Soc. Sec.*, No. 08-2906, 2009 WL 2445129, at *1 (3d Cir. 2009) (citing *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)); *Ramirez v. Barnhart* 372 F.3d 546, 552 (3d Cir. 2004). When a hypothetical question is deficient, remand is required. *Alley v. Astrue*, 862 F. Supp. 2d 352, 365 (D. Del. 2012). The Third Circuit has provided guidance regarding whether an impairment must be included in the hypothetical:

> Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to

28

the expert, preclude reliance on the expert's response . . . . Relatedly, the ALJ may not substitute his or her own expertise to refute such record evidence. Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason. Finally, limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible. In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it.

*Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (internal citations omitted). If an ALJ does not accept some or all medically established limitations, she is required to explain which limitations she rejected and her reasons for doing so. *Fargnoli,* 247 F.3d at 43. Finally, an ALJ has an affirmative duty to explore conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT"). SSR 00-4p, 2000 WL 1898704, at *4. "When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict." *Id.*

Here, plaintiff claims the hypothetical failed to account for limitations identified by her treating physicians, the state agency physicians, and those accepted by the ALJ because the hypothetical did not include limitations to occasional use of the upper extremities for some work related functions. D.I. 8 at 12. Plaintiff further argues that the hypothetical did not encompass reasoning level, only skill level. *Id.* at 15.

Because the ALJ did not rely upon a hypothetical that incorporated all of

plaintiff's established limitations supported by medical evidence, the substantial evidence burden of identifying other work that plaintiff can perform has not been met.

The ALJ's finding that plaintiff is capable of employment as an inspector, routing clerk, and order clerk shows she relied on the VE's response to hypothetical three, limited light work at SVP one or two. That hypothetical excluded restrictions on the use of hands and plaintiff's physical and psychiatric conditions.[23] The ALJ acknowledged plaintiff suffers from bilateral carpal tunnel.[24] *Id.* at 22. Moreover, opinions of the State Agency physicians and the ALJ's comments during the hearing confirm some limitations in the use of upper extremities. *Id.* at 58, 78. To constitute substantial evidence, the hypothetical must accurately convey all of the claimant's impairments supported in the record. *See Ramirez,* 372 F.3d at 552. The record does not indicate why these uncontroverted medical conclusions were not relied upon by the ALJ.

The ALJ failed to limit her hypothetical to "simple" reasoning jobs. Having found that plaintiff is limited to "simple unskilled work," the ALJ should have limited the hypothetical to simple work of reasoning level one.

Finally, the ALJ failed to evaluate whether conflict existed between the DOT and the VE's testimony with regard to handling and fingering. The hypothetical accepted by the ALJ included the position of order caller, a job which according to the DOT requires frequent handling and fingering. The hypothetical was limited to jobs requiring the

---

[23] Hypothetical four incorporated restrictions on the use of hands; hypothetical five totally incorporated all alleged conditions. D.I. 5 at 67-68.
[24] "[E]lectrodiagnostic evidence of bilateral carpal tunnel...[i]t doesn't assess the degree, which is kind of surprising. *Well, okay, you've got it.*" *Id.* at 58 (emphasis added).

occasional use of hands, which the ALJ was obliged to address.

Because the ALJ failed to include medically established limitations in her findings, advise why such limitations were ignored, and address and resolve conflicts between the VE testimony and the DOT, the court finds that the ALJ's findings were not based on substantial evidence. *See Chrupcala,* 829 F.2d at 1276. The matter is remanded for the ALJ to remedy discrepancies between supported medical restrictions and DOT specifications.

### D. Step Two Analysis and Articulation of the Administrative Decision

Finally, plaintiff argues the ALJ's decision lacks the articulation required for meaningful judicial review and the reasoning for denying her claim. D.I. 8 at 17. As lack of articulation is a common theme to plaintiff's claims, it will be separately addressed.

### 1. The Step Two Analysis

Defendant reasons the ALJ's failure to articulate as to why some of plaintiff's medical conditions are not severe at Step Two is harmless error,[25] because the ALJ found in favor of plaintiff at step two and continued the evaluation. D.I. 10 at 18.

"The Step Two determination as to whether [p]laintiff is suffering from a severe impairment is a threshold analysis requiring the showing of only one severe impairment." *Popp v. Astrue*, C.A. No. 08-1347, 2009 WL 959966, at *4 n.1 (W.D. Pa. Apr. 7, 2009). "Because the ALJ found in [plaintiff's] favor at Step Two, even if [s]he had erroneously concluded that some of her other impairments were non-severe, any

---

[25] Conditions in question are bronchitis, migraines, right knee meniscus tear, and attention deficit disorder. D.I. 8 at 18; D.I. 10 at 18.

error was harmless." *Salles v. Commissioner of Social Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007). Since the outcome of the case is not affected, remand is not necessary with respect to the Step Two analysis. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d. Cir. 2005).

Here, the ALJ found in favor of plaintiff in Step Two and continued the evaluation. D.I. 5 at 22. In her findings, the ALJ identified four severe impairments: degenerative disc disease; fibromyalgia/chronic pain syndrome; carpal tunnel syndrome; and obesity. *Id.* In a simple threshold test, a finding of only one severe impairment satisfies Step Two. Any additional severe impairments do not change the analysis. Whether the ALJ found plaintiff's additional impairments severe is not dispositive of a Step Two analysis, since the ALJ's evaluation continued. Accordingly, substantial evidence supports the ALJ's findings regarding Step Two.

### 2.   Articulation of the Administrative Decision

An unfavorable decision from the Commissioner must contain a discussion of the evidence and a statement of the determination with the supporting rationale. 42 U.S.C. §405(b)(1). "[T]he courts cannot exercise their duty of review unless they are advised of the considerations underlying the actions under review." *Chenery*, 318 U.S. at 94. "[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *Id.* This is especially true when evidence has been rejected:

> This Court has recognized that there is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record . . . . [I]n *Kennedy v. Richardson*, 454 F.2d 376 (3d Cir.1972), we vacated and remanded the

32

decision of the ALJ because it failed to afford an explanation why the ALJ rejected medical evidence that supported the claimant which was inconsistent with other medical evidence and the ALJ's findings . . . .

*Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983) (quoting *Cotter v. Harris, 642 F.2d 700, 706* (3d Cir. 1981)). The "ALJ did err by reason of his failure to consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." *Burnett*, 220 F.3d at 121.

"The RFC assessment must be based on *all* of the relevant evidence in the case record, such as: [m]edical history; [l]ay evidence; [m]edical source statements; [e]ffects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." S.S.R. 96-8p, 1996 WL 374184, at *5 (emphasis in original). "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Id.* A non-severe limitation does not function in a vacuum; in concert with other impairments, a non-severe impairment may narrow the range of work that an individual can perform. *Id.*

"Although the ALJ may determine credibility, she must indicate that evidence rejected and her reasons for discounting it. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Solomon v. Colvin*, No. C.A. No. 12-1406-RGA-MPT, 2013 WL 5720302, at *11 (D. Del. Oct. 22, 2013) (internal citations omitted). "It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2000) (plurality) (dicta).

Here, the ALJ's decision is not sufficiently articulated. Plaintiff maintains that the

ALJ did not sufficiently articulate how she incorporated the impairments into her RFC findings and her conclusion of the prior relevant work ("PRW") as an accounting clerk. D.I. 5 at 18.

Defendant counters that the ALJ accounted for plaintiff's bronchitis by limiting exposure to cold temperature; for migraines and attention deficit disorder by restricting plaintiff to simple, unskilled work; and for the meniscus tear of the right knee by limiting postural activities. D.I. 10 at 19. This marriage of the medical condition and resulting impairment to the limitation, however, is absent from the ALJ's RFC finding. D.I. 5 at 26. The ALJ lists both severe and non-severe impairments in the Step Two analysis (Finding 3), then lists work restrictions in Step Five (Finding 5). *Id.* at 22-24. There is no indication that the ALJ applied the work restrictions in consideration of the severe and non-severe impairments. The limitations imposed by each condition as cited by defendant appear only in the briefing. D.I. 10 at 19. Such specific findings must be expressed by the ALJ. The ALJ's RFC finding did not sufficiently explain how she accommodated plaintiff's non-severe medical conditions. Therefore, this court cannot determine whether it is supported by substantial evidence.

With regard to plaintiff's alleged attention deficit disorder, the ALJ's explanation of how she determined functional effects is sufficient. The ALJ considered four functional areas in her evaluation.[26] In each area, the ALJ drew conclusions from the Activities of Daily Living reports submitted by plaintiff, and provided a basis for her

---

[26] Section 12.00C of 20 C.F.R. Part 404, Subpart P, Appendix 1 defines the criteria, known as "paragraph B" criteria, as: activities of daily living; social functioning; concentration, persistence or pace; and decompensation.

determination. D.I. 5 at 23, 200-09. The ALJ did not rely on the State Agency physician's findings in determining the severity of plaintiff's attention deficit disorder. Therefore, the ALJ's decision is properly articulated.

The ALJ committed harmless error in failing to articulate how she concluded that plaintiff had PRW as an accounting clerk,[27] since the ALJ concluded that plaintiff was currently unable to perform such work. *Id.* at 28. .

The discrepancy between the DOT numbers provided by the ALJ and those identified by the VE appears to be a typographical error. D.I. 5 at 29, 66-67. The number for routing clerk cited by the ALJ does not appear in the DOT. On remand, the ALJ should confirm the correct number.

### E. Walking and Standing Limitations

Plaintiff alleges the ALJ's RFC finding is non-specific on her walking and standing abilities because light work requires standing and walking for 1/3 of an eight hour work day, while the ALJ limited her to two to six hours in this regard. D.I. 8 at 16. If limited to the lower end of that range, plaintiff argues that she cannot stand or walk for 1/3 of the work day, or 2.66 hours, and must be found disabled. *Id.*

The court cannot presently address this argument in light of the prior findings herein regarding the RFC assessment, which is remanded for further analysis.

### V. Conclusion

For the foregoing reasons, I recommend that:

(1) Plaintiff's motion for summary judgment (D.I. 7) be granted in part and denied

---

[27] PRW is work done within the past 15 years, for a period long enough to be considered substantial gainful activity. 20 C.F.R. §404.1565(a).

in part;

(2) The Commissioner's motion for summary judgment (D.I. 9) be granted in part and denied in part; and

(3) The matter be remanded in part to the ALJ for further proceedings consistent with this opinion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. DEL. LR 72.1. The parties may serve and file specific written objections within ten (10) days after being served with a copy of this Report and Recommendation.

The parties are directed to the Court's Standing Order in Non–Pro Se matters for Objections Filed under FED. R. CIV. P. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov.

Date: August 20, 2015            /s/ Mary Pat Thynge
                                 UNITED STATES MAGISTRATE JUDGE